**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RAHIM NOORALI KASSAM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>QFIN HOLDINGS, INC., HAISHENG WU, ALEX XU, and YAN ZHENG,<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Rahim Noorali Kassam ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Qfin Holdings, Inc. ("Qfin" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Qfin securities between March 18, 2026 and August 25, 2026, both dates inclusive (the "Class Period"), seeking to recover

damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Qfin, together with its subsidiaries, operates a purported artificial intelligence- ("AI") driven credit technology platform under the "Qifu Jietiao" brand in the People's Republic of China ("China" or the "PRC"). The Company provides credit-driven services that match borrowers with financial institutions to conduct borrower acquisition, credit assessment, fund matching, and post-facilitation services, as well as various consumer finance-related platform services, including, *inter alia*, loan-facilitation services to financial institution partners, an intelligence credit engine, and referral services. The Company serves financial institutions, consumers, and small and micro-enterprises.

3. In 2025, China's consumer finance industry began a systemic restructuring in response to new PRC regulatory guidance, including the introduction of several key policies, such as new loan facilitation rules, window guidance[1] for consumer finance companies, and guidelines on comprehensive financing cost management for micro lenders. As Qfin's former Chief Executive Officer ("CEO"), Defendant Haisheng Wu ("Wu"), acknowledged, "[i]n the near term, these measures tightened market liquidity, which in turn suppressed credit demand and put unprecedented pressure on both loan growth and risk management across the industry."

4. Notwithstanding the resulting regulatory headwinds, Defendants, throughout the Class Period, touted Qfin's ability to not only weather, but also adapt and thrive in response to, the recent and emerging PRC regulations affecting its business. For example, at all relevant times, Defendants characterized Qfin's business as, *inter alia*, "resilient", "steady", and "stable" in the

[1] "Window guidance" is a relatively informal policy instrument that compels or "guides" financial institutions to extend credit and allocate lending in line with official (government) targets.

face of these regulations, while touting the Company's purportedly "proactive" strategies and policies designed to improve, and which were purportedly already improving, Qfin's risk performance and other operational metrics.

5. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated the resiliency and stability of Qfin's business and financial results despite regulatory changes; (ii) Defendants likewise downplayed the true scope and severity of the negative impact that regulatory headwinds were likely to have, and were already having, on the Company's business and financial results; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6. The truth began to emerge on August 25, 2026, when Qfin issued a press release during post-market hours announcing its second quarter ("Q2") and interim 2026 unaudited financial results. The Company reported, *inter alia*, that total net revenue fell 31.6% year-over-year ("Y/Y") from approximately RMB 5.22 billion to approximately RMB 3.57 billion, significantly missing consensus estimates. In addition, net income plummeted 76.8% Y/Y from approximately RMB 1.73 billion to RMB 401.4 million, heavily impacted by an unexpected RMB 500 million tax expense "caused by a change in tax treatment of certain entities based on the updated interpretation of related tax regulations by the tax authorities." Management also issued disappointing forward financial guidance, projecting a 67% to 73% Y/Y decrease in third quarter ("Q3") non-GAAP[2] net income due to rising funding costs and systemic liquidity shocks in the Chinese consumer credit market.

[2] "GAAP" refers to U.S. generally accepted accounting principles.

7. In discussing these disappointing results, Defendant Wu cited, *inter alia*, "a challenging market environment marked by continued industry contraction, tighter regulatory oversight, and a sudden industry-wide liquidity shock in late June", warning that, "[l]ooking ahead, we expect industry adjustments to continue, with funding conditions and risk management likely to remain under pressure."

8. On this news, Qfin's American depositary share ("ADS") price fell $2.18 per ADS, or 18.91%, to close at $9.35 per ADS on August 26, 2026.

9. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Per Qfin's most recent annual report on Form 20-F, as of December 31, 2025, there were 243,823,900 of the Company's Class A ordinary shares issued and outstanding. Qfin's ADSs, each representing two of the Company's Class A ordinary shares, trade in the U.S. on the Nasdaq Global Select Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in Qfin's securities located in the U.S., some of whom undoubtedly reside in this District.

13. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14. Plaintiff, as set forth in the attached Certification, acquired Qfin securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15. Defendant Qfin is a Cayman Islands corporation with principal executive offices located at Building 1, No. 98 Qingyijiang Road, Putuo District, Shanghai 200331, China. The Company's ADSs trade in an efficient market on the NASDAQ under the ticker symbol "QFIN".

16. Defendant Wu served as Qfin's CEO at all relevant times. Defendant Wu stepped down as Qfin's CEO effective September 21, 2026.

17. Defendant Alex Xu ("Xu") has served as Qfin's Chief Financial Officer at all relevant times.

18. Defendant Yan Zheng ("Zheng") served as Qfin's Chief Risk Officer at all relevant times. Defendant Zheng was appointed as Qfin's CEO effective September 21, 2026.

19. Defendants Wu, Xu, and Zheng are collectively referred to herein as the "Individual Defendants".

20. The Individual Defendants possessed the power and authority to control the contents of Qfin's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Qfin's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent

their issuance or to cause them to be corrected. Because of their positions with Qfin, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

21. Qfin and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

22. Qfin, together with its subsidiaries, operates a purported AI-driven credit technology platform under the "Qifu Jietiao" brand in China. The Company provides credit-driven services that match borrowers with financial institutions to conduct borrower acquisition, credit assessment, fund matching, and post-facilitation services, as well as various consumer finance-related platform services, including, *inter alia*, loan-facilitation services to financial institution partners, an intelligence credit engine, and referral services. The Company serves financial institutions, consumers, and small and micro-enterprises.

23. In 2025, China's consumer finance industry began a systemic restructuring in response to new PRC regulatory guidance, including the introduction of several key policies, such as new loan facilitation rules, window guidance for consumer finance companies, and guidelines on comprehensive financing cost management for micro lenders. As Defendant Wu acknowledged, "[i]n the near term, these measures tightened market liquidity, which in turn

suppressed credit demand and put unprecedented pressure on both loan growth and risk management across the industry."

24. Notwithstanding the resulting regulatory headwinds, Defendants, throughout the Class Period, touted Qfin's ability to not only weather, but also adapt and thrive in response to, the recent and emerging PRC regulations affecting its business. For example, at all relevant times, Defendants characterized Qfin's business as, *inter alia*, "resilient", "steady", and "stable" in the face of these regulations, while touting the Company's purportedly "proactive" strategies and policies designed to improve, and which were purportedly already improving, Qfin's risk performance and other operational metrics.

**<u>Materially False and Misleading Statements</u>**

25. The Class Period begins on March 18, 2026. On March 17, 2026, during post-market hours, Qfin issued a press release announcing its fourth quarter ("Q4") and full year ("FY") 2025 unaudited financial results. The press release quoted Defendant Wu as acknowledging the ongoing industry-wide headwinds caused by recent regulatory changes, while assuring investors that Defendants had "tighten[ed] risk standards, adjust[ed] business mixes, and optimiz[ed] cost structure, to mitigate some of the impact", was implementing measures "to maintain resilience of our baseline business", and "are prepared to take decisive action to further streamline our operations and optimize resource allocations."

26. The same press release quoted Defendant Xu as likewise touting Qfin's ability to weather ongoing industry challenges, stating, in relevant part[3]:

> ***We met most of our operational and financial targets in the fourth quarter under an extremely challenging environment*** . . . . [W]e generated a record-setting RMB11.1 billion in cash from operations in 2025 . . . . We also utilized a narrow market window to retire a substantial portion of our long term debt, which further strengthened our balance sheet. ***Our strong financial position is expected to enable***

[3] All emphases herein are added unless otherwise indicated.

> ***us to navigate through this particularly challenging environment, achieve our strategic goals, and meet our commitment and obligations to the market.***

27. Similarly, the press release quoted Defendant Zheng as stating, in relevant part:

> In the fourth quarter, we experienced noticeable increase in portfolio risks as macro headwinds and regulatory uncertainties continued to put significant pressure on market liquidity, particularly in the high-risk segment . . . . ***However, the risk tightening measures we took during the quarter started to show marginally favorable results in recent months, as the risk performance of new loans started to improve and their contribution gradually increased.***

28. Also on March 17, 2026, during post-market hours, Qfin hosted a conference call with investors and analysts to discuss its Q4 and FY 2025 results. During the call, the Individual Defendants continued to tout Qfin's ability to weather and adapt to industry-wide regulatory headwinds and preserve the stability of its operations. For example, during his prepared remarks on the call, Defendant Wu represented that Qfin's business and financial prospects would ***grow stronger*** because of the recent regulatory changes, stating, *inter alia*:

> We are witnessing a regulatory-driven restructuring that will likely accelerate industry consolidation over the next 2 years.
>
> As a leading credit tech platform, ***we embrace this evolution as an opportunity to upgrade our core competencies and build the foundation for sustainable long-term growth. By navigating this cycle, we expect to emerge as a stronger and more resilient industry leader with deeper structural moats.***

29. Defendant Wu also made various statements during his prepared remarks pertaining to Qfin's purportedly "stable" results, the "resilienc[y]" of its operations, and its overall ability to weather and adapt to regulatory changes, a sampling of which include, *inter alia*:

- "We have ***proactively pivoted our strategy to embrace regulatory changes***, by putting compliance and risk management at the core of our strategy."
- "We concluded 2025 with ***resilient financial and operational results***."
- "Our performance ***remains resilient and stable overall***."

- "Against [a] challenging backdrop, we prioritize risk management and ***promptly adjusted risk strategies across the entire credit life cycle to ensure sustainable, high-quality growth***."
- "***[W]e maintain stable originations to high-quality borrowers*** while strategically contracting higher-risk segments, ***resulting in a meaningfully improved asset mix***."
- "[O]ur 30-day collection rate improved marginally month-over-month in both November and December, ***indicating steady recovery in collection efficiency***."
- "Despite a challenging industry environment, ***our risk strategies continue to deliver tangible results.***"
- "Looking ahead, given the uncertainty around the regulatory environment and industry liquidity in the coming months, ***we will continue to dynamically adjust our risk strategies to bolster business resilience amid market volatility***."
- "Looking to 2026, the funding environment remains challenging, which may cause short term volatility in our funding costs. ***However, our track record of consistent asset performance has enabled us to build a strong, trusted partnerships with financial institutions, ensuring a well-positioned funding access relative to industry peers.***"
- "[W]e will continue to diversify our funding channels, and optimize our funding structure ***to ensure stable liquidity and competitive funding costs amid market volatility***."
- "By leveraging dynamic pricing and a superior user experience, ***we will continue to grow the proportion of high-quality users within our customer mix***, maximizing customer lifetime value and ***ensuring stable asset quality***."

30. On the same call, also during his prepared remarks, Defendant Xu likewise downplayed the severity of ongoing regulatory headwinds while simultaneously touting Qfin's ability to weather the same, stating, *inter alia*, that "[w]e will likely maintain controlled pace to acquire new users in the near term in response to the changing regulatory directions and still uncertain macro condition", and that, "[w]ith our latest risk tightening measures in place, we started to see marginal improvement in overall risk performance in recent months."

31. Similarly, in response to an analyst's question on the call regarding "the trend of risk indicators so far this year" and "[a]nd how do you foresee the future trend of risk changes", Defendant Zheng stated, *inter alia*[4]:

> So in the fourth quarter, the industry faced huge pressure due to tightened liquidity. We took proactive steps in both underwriting and collections. ***And by far, we have seen clear results.***

32. On April 27, 2026, Qfin filed an annual report on Form 20-F with the SEC, reporting its financial and operating results for its Q4 and FY ended December 31, 2025 (the "2025 20-F"). The 2025 20-F stated, *inter alia*:

> In order to assess uncertain tax positions, the Group [*i.e.*, Qfin, its subsidiaries and its consolidated variable interest entities ("VIEs")] applies a more likely than not threshold and a two-step approach for the tax position measurement and financial statement recognition. Under the two-step approach, the first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates that it is more likely than not that the position will be sustained, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely of being realized upon settlement. The Group recognizes interest and penalties, if any, under accrued expenses and other current liabilities on its consolidated balance sheets and under other expenses in its consolidated statements of operations. ***The Group did not have any significant unrecognized uncertain tax positions as of and for the years ended December 31, 2024 and 2025.***

33. With respect to taxation in Hong Kong, the 2025 20-F stated, in relevant part:

[4] Defendant Zheng's statements during the call were translated into English by another Company employee providing interpretation services.

Our subsidiary incorporated in Hong Kong is subject to Hong Kong profit tax at a rate of 16.5%. No Hong Kong profit tax has been levied as we did not have an assessable profit that was earned in or derived from the Hong Kong subsidiary during the periods presented. Hong Kong does not impose a withholding tax on dividends.

34. With respect to taxation in mainland China, the 2025 20-F stated, *inter alia*:

Generally, our PRC subsidiaries, the VIEs and the VIEs' subsidiaries, which are considered PRC resident enterprises under mainland China tax law, are subject to enterprise income tax on their worldwide taxable income as determined under PRC tax laws and accounting standards at a rate of 25%.

The consolidated trusts are subject to VAT [value added taxes] at the rate of 3%, while our other entities are subject to VAT at the rate of 6% as general taxpayers, and related surcharges on revenue generated from providing services. The Enterprise Income Tax Law and its implementation rules permit certain "high and new technology enterprises strongly supported by the state" that hold independent ownership of core intellectual property and simultaneously meet a list of other criteria, financial or non-financial, as stipulated in the Implementation Rules and other regulations, to enjoy a reduced 15% enterprise income tax rate. The STA [State Taxation Administration], the Ministry of Science and Technology and the Ministry of Finance jointly issued the Administrative Measures on the Recognition for High and New Technology Enterprise delineating the specific criteria and procedures for the "high and new technology enterprises" certification in April 2008, which was amended in January 2016. Shanghai Qiyu was accredited as a "high and new technology enterprises" in 2018, which was renewed in 2021 and 2024. Therefore, it was entitled to a reduced 15% enterprise income tax rate from 2018 to 2026. Our WFOE [Shanghai Qiyue Information Technology Co., Ltd.] obtained "high and new technology enterprises" status in 2020 and renewed it in 2023, and was entitled to a reduced enterprise income tax rate of 15% from 2020 to 2025. Beihai Borui Credit Service Co., Ltd., Beihai Qicheng Information & Technology Co., Ltd. ("Qicheng"), Qi'ang and Beihai Yunhua benefited from a preferential tax rate of 15% as their operation falls within the encouraged industries catalogue in western China. The 40% of the enterprise income tax payables of Qicheng, Qi'ang and Beihai Yunhua could be further reduced as they are located in an autonomous region of China. Therefore, Qicheng applied a preferential income tax rate of 9% from 2019 to 2023 and applied a preferential income tax rate of 15% from 2024 to 2030. Qi'ang and Beihai Yunhua applied a preferential income tax rate of 9% from 2023 to 2027. From 2023 to 2027, one subsidiary benefited from a preferential tax rate of 15% as they are registered in Hainan province and engaged in encouraged business activities.

* * *

The Organization for Economic Co-operation and Development, or OECD, published Pillar Two model rules in December 2021, with the effect that a jurisdiction may enact domestic tax laws, which are referred to as Pillar Two legislation, to implement the Pillar Two model rules on a globally agreed common approach. Pillar Two legislation applies to a member of a multinational group within the scope of the Pillar Two model rules, which our company is reasonably expected to fall into. It imposes a top-up tax on profits arising in a jurisdiction whenever the effective tax rate determined by the Pillar Two model rules on a jurisdictional basis is below a minimum rate of 15%. We have reviewed its corporate structure in light of the introduction of Pillar Two model rules in various jurisdictions and engaged external tax specialists in assessing its tax exposure. As at December 31, 2025, our company mainly operates in mainland China, in which exposures to Pillar Two income taxes might exist in the future although the legislation is not yet enacted. Besides, certain subsidiaries of our company are located in jurisdictions mainly including Hong Kong, Singapore and United Kingdom where Pillar Two legislation had been enacted or substantively enacted, it is estimated that our company's income tax would not be materially different should those legislations had been in effect for the year ended December 31, 2025. We did not recognize any relevant tax expenses for the year ended December 31, 2025.

35. With respect to taxation on dividends in mainland China, the 2025 20-F stated, in relevant part:

Dividends paid by our wholly foreign-owned subsidiaries in mainland China to our intermediary holding company in Hong Kong will be subject to a withholding tax rate of 10%, unless the Hong Kong entity satisfies all the requirements under the Arrangement between Mainland China and the Hong Kong Special Administrative Region for the Avoidance of Double Taxation and Tax Evasion on Income with respect to Taxes on Income and Capital and receives approval from the tax authority. If our Hong Kong subsidiary satisfies all the requirements under the tax arrangement and receives approval from the tax authority, then the dividends paid to the Hong Kong subsidiary would be subject to withholding tax at a rate of 5%. Since the equity holders of the major PRC subsidiaries of our company are Hong Kong incorporated companies and meet the relevant requirements pursuant to the tax treaty between PRC and Hong Kong, we have used 5% to provide for deferred tax liabilities on retained earnings which are anticipated to be distributed . . . .

If our holding company in the Cayman Islands or any of our subsidiaries outside of mainland China were deemed to be a "resident enterprise" under the Enterprise Income Tax Law, it would be subject to enterprise income tax on its worldwide income at a rate of 25% . . . .

In 2025, our WFOE made dividend payments of RMB4,587.0 million (US$655.9 million) to our Hong Kong subsidiaries and paid related withholding income tax

> (net of tax refund) of RMB200.6 million (US$28.7 million) accordingly. As of December 31, 2025, we recorded a deferred tax liability of RMB255.0 million (US$36.5 million) associated with all of our earnings expected to be distributed from mainland China subsidiaries to overseas for dividend distribution and share repurchase. The remaining undistributed profits of mainland China subsidiaries as of December 31, 2025 would be indefinitely reinvested with unrecognized deferred tax liabilities of approximately RMB804.3 million (US$115.0 million).

36. With respect to Qfin's response to recent regulatory changes, the 2025 20-F stated, in relevant part:

> In the second half of 2025, the consumer credit industry experienced a sector-wide risk elevation amid regulatory changes and subsequent business adjustments. ***Despite the challenging backdrop, we promptly adjusted our risk strategies across the entire credit lifecycle to manage our risk performance.***

37. Further, the 2025 20-F touted the purported durability of Qfin's asset quality, stating, in relevant part:

> We believe our industry-leading credit assessment capabilities are a key competitive advantage allowing us to expand our business ***while maintaining consistently solid asset quality*** of the loan portfolios. Our credit assessment technology solutions are built upon a comprehensive database, a sophisticated credit profiling engine, and an efficient post-facilitation service process.

38. Appended as exhibits to the 2025 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Wu and Xu certified that the 2025 20-F "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report[.]"

39. On May 26, 2026, Qfin issued a press release announcing its first quarter ("Q1") 2026 unaudited financial results. Defendant Wu, as quoted in the press release, continued to tout

Qfin's purportedly "strong resilience" and ability to "withst[an]d the pressure" of ongoing regulatory headwinds, while simultaneously downplaying the full scope and severity of these headwinds, stating, in relevant part:

> In the first quarter, the industry continued to undergo deep adjustments while regulations tightened further. ***Yet we withstood the pressure.*** Through proactive efforts to tighten our credit standards, optimize our loan portfolio, and streamline operations, ***we demonstrated strong resilience, achieving improved risk performance and other operational metrics***. More importantly, as we expand our user base to serve more high-quality customers, ***we are building a more sustainable business model capable of navigating cycles***.
>
> Looking ahead, near-term uncertainties are likely to persist, and industry participants continue to adjust operations to reflect the changing regulatory environment. ***However, as the industry landscape reshapes, we believe the entire ecosystem of the consumer finance market will become healthier and more efficient, which should be more conducive to our long-term development.***

40. Similarly, the press release quoted Defendant Xu as touting Qfin's "solid quarter" "[a]gainst the backdrop of regulatory tightening," which was purportedly "underpinned by improved risk performance and operational efficiency", as well as the Company's "strengthen[ed] . . . balance sheet" and "strong financial position [that] ***enables us to thrive in this particularly challenging market environment***, execute our global expansion roadmap, and return value to shareholders."

41. Defendant Zheng, as quoted in the same press release, also represented that "***our asset quality steadily improved in the first quarter and remained stable in recent months***", and that, "[g]iven the continuously changing regulatory environment and market dynamic, we will remain vigilant to maintain a tight control of our portfolio quality and strive to position ourselves to be more resilient to potential challenges."

42. Also on May 26, 2026, Qfin hosted a conference call with investors and analysts to discuss its Q1 2026 results. During his prepared remarks on the call, Defendant Wu stated, *inter*

*alia*, that notwithstanding ongoing regulatory headwinds, "we delivered a ***resilient*** performance in Q1 with ***notable improvements in risk indicators and operation efficiency***."

43. Similarly, Defendant Wu represented that, "[i]n the second half of 2025, we continuously tightened risk policies, ***and this forward-looking strategy began to translate into tangible results in Q1***", with Defendants "further iterat[ing] and optimiz[ing] our underlying risk capabilities across the entire credit life cycle" during the quarter.

44. Also during his prepared remarks on the call, Defendant Xu touted the purportedly "***noticeable risk improvement*** in Q1" which "was mainly related to our risk tightening measures and loan mix shift toward new loans", that "***we saw continued modest improvement in the overall risk performance in recent months***", and that "***we are encouraged by the noticeable improvement in risk metrics***[.]"

45. The statements referenced in ¶¶ 25-44 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated the resiliency and stability of Qfin's business and financial results despite regulatory changes; (ii) Defendants likewise downplayed the true scope and severity of the negative impact that regulatory headwinds were likely to have, and were already having, on the Company's business and financial results; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

46. In addition, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Qfin to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable

impact on net sales or revenues or income from continuing operations." Defendants failed to disclose, *inter alia*, that regulatory changes were likely to have, or were already having, a significantly more negative impact on Qfin's earnings and other operational metrics than represented. Defendants' failure to disclose these issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**The Truth Begins to Emerge**

47. The truth began to emerge on August 25, 2026, when Qfin issued a press release during post-market hours announcing its Q2 and interim 2026 unaudited financial results. The Company reported, *inter alia*, that total net revenue fell 31.6% Y/Y from approximately RMB 5.22 billion to approximately RMB 3.57 billion, significantly missing consensus estimates. In addition, net income plummeted 76.8% Y/Y from approximately RMB 1.73 billion to RMB 401.4 million, heavily impacted by an unexpected RMB 500 million tax expense "caused by a change in tax treatment of certain entities based on the updated interpretation of related tax regulations by the tax authorities."

48. In discussing these disappointing results, Defendant Wu, as quoted in the same press release, cited "a challenging market environment marked by continued industry contraction, tighter regulatory oversight, and a sudden industry-wide liquidity shock in late June", warning that, "[l]ooking ahead, we expect industry adjustments to continue, with funding conditions and risk management likely to remain under pressure."

49. Also on August 25, 2026, during post-market hours, Qfin hosted a conference call with investors and analysts to discuss its Q2 2026 results. During the call, Defendant Wu further disclosed, *inter alia*:

> Since the start of 2026, China's consumer finance industry has remained under pressure. According to the People's Bank of China, the outstanding balance of short-term household consumer loans fell by more than RMB 660 billion from the beginning of the year through the end of Q2, reflecting continued voluntary and involuntary deleveraging among households. Meanwhile, regulatory oversight continued to tighten. A series of measures were introduced to close regulatory gaps and promote a healthier, more compliant industry environment. These measures bring the entire credit industry under a stricter framework, covering pricing, marketing, funding, collections and payments.
>
> In late June, an unexpected industry event then triggered a crisis of confidence in the loan facilitation sector. This caused liquidity to tighten sharply across the market.
>
> * * *
>
> Following [the] unexpected industry event in late June, financial institutions have become increasingly risk-averse. Funding supply has fallen sharply, placing the industry under significant liquidity pressure . . . . We expect funding conditions to remain tight in the second half of the year with funding costs to potentially increase.
>
> * * *
>
> On the regulatory front, new requirements covering comprehensive financing cost of personal loans disclosures and the online marketing of financial products are taking effect in Q3. Together, these measures establish higher standards for transparency and consumer protection across the industry. They also raised the bar for our operational execution. Meanwhile, an ongoing nationwide regulatory campaign targeting the collection industry has led to a severe shortage of collection capacity across the board and put significant near-term pressure on collection costs and efficiency.

50. Defendant Xu echoed Defendant Wu's comments on the call, stating that an "unexpected crisis at some peers in late June triggered an industry-wide liquidity squeeze, compounded by increasingly stringent regulatory scrutiny, which caused significant changes in industry behavior and reshaped the landscape." Defendant Xu further disclosed that, "given the volatile market environment and serious mishaps among some peers and intensifying regulatory scrutiny, we continue to face heavy headwinds in the coming quarters." Accordingly, he provided disappointing forward financial guidance, stating, in relevant part:

> [R]egarding our business outlook, given the macro and the regulatory headwinds, we will take extra cautious approach in business planning for the rest of 2026. For the third quarter of 2026, the company expects to generate non-GAAP net income between RMB 400 million and RMB 500 million, ***representing year-on-year decline between 67% and 73%***.

51. Following the foregoing disclosures, Qfin's ADS price fell $2.18 per ADS, or 18.91%, to close at $9.35 per ADS on August 26, 2026.

52. The foregoing news also spurred a slew of negative reactions from market analysts. For example, on August 26, 2026, J.P. Morgan issued a report on Qfin, downgrading it to an "Underweight" from "Neutral" rating, while cutting its price target ("PT") by 33% to $9.00, citing "intensifying industry headwinds" and "[a]sset quality [that] deteriorated sharply in August," while noting that "[m]anagement expects risk normalization to take two to three quarters[.]"

53. The same day, Morgan Stanley issued a report on Qfin, downgrading the Company to an "Equal-weight" from "Overweight" rating, while cutting its PT to $13.00 from $25.00, stating, *inter alia*, that "[c]hallenges from liquidity and bad debt collection in the sector will pressure Qfin's core operations, which led to weak 3Q26 profit guidance", while noting that the "[o]ne-off tax charge led 2Q26 earnings to miss" and "**[r]egulatory headwind[s] since July could put pressure on loan volume and credit quality in the next several quarters**[.]" (Emphasis in original.)

54. Also on August 26, 2026, Jeffries issued a report on Qfin, cutting is PT to $15.40 from $20.40, stating that "loan volume c[ame] in below our forecasts", "non-GAAP earnings [were] behind expectations", "[m]id-point of 3Q earnings guidance was behind consensus", and that "[w]e expect loan volume and earnings to be impacted by macro uncertainties, tightening regulations and industry sentiment in coming quarters."

55. The following day, Deutsche Bank, too, issued a report on Qfin, cutting its PT to $9.80 from $13.00, citing, *inter alia*, the one-off RMB 500 million tax charge, revenue that declined on lower pricing and loan balances, and "**[t]wo major headwinds** [that] are anticipated to hit 3Q26 lender sector performance: (1) the recent **liquidity shock** caused by Juzi Digitech in late June, which triggered an industry-wide liquidity crunch as funding partners tightened their risk appetite; and (2) **a new round of curbs on loan collection practices**, which has led to a significant collector shortage." (Emphases in original.)

56. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

57. During the Class Period, Defendants had both the motive and opportunity to commit fraud. Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Throughout the Class Period, regulatory headwinds were top-of-mind for Defendants, as exhibited by their numerous, highly specific statements regarding these headwinds in periodic earnings releases and calls, as referenced *supra*. Further, Defendants consistently attested to their focus on these very issues at all relevant times, particularly as regulatory headwinds had systemically restructured Qfin's entire industry. Accordingly, Qfin's ability to adapt to and weather ongoing regulatory headwinds, stemming from major policy changes beginning in 2025—*i.e.*, before the start of the Class Period—was undoubtedly of paramount importance to Defendants and, indeed, Defendants attested to as much during the Class Period. Nonetheless, Defendants repeatedly characterized Qfin's business, operations, and financial results as purportedly "resilient", "steady",

and "stable" despite these regulations, while simultaneously touting the Company's strategies and policies that had purportedly improved Qfin's risk performance and other operational metrics. In so doing, Defendants pitched Qfin to investors as an outlier in the Chinese consumer finance industry, one that would benefit from the deterioration of its purportedly less sophisticated and established competitors while the Company deepened its own competitive moat, even as its own business was likewise significantly deteriorating. Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

58. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the Company's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

59. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Qfin securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Qfin or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

60. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

61. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

62. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Qfin;
- whether the Individual Defendants caused Qfin to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Qfin securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

63. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

64. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Qfin securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold Qfin securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

65. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

66. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

67. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

68. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

69. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Qfin securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Qfin securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

70. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Qfin securities. Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Qfin's finances and business prospects.

71. By virtue of their positions at Qfin, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

72. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Qfin, the Individual Defendants had knowledge of the details of Qfin's internal affairs.

73. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Qfin. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Qfin's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Qfin securities was artificially inflated throughout the Class Period. In ignorance of the adverse

facts concerning Qfin's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Qfin securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

74. During the Class Period, Qfin securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Qfin securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Qfin securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Qfin securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

75. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

77. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78. During the Class Period, the Individual Defendants participated in the operation and management of Qfin, and conducted and participated, directly and indirectly, in the conduct of Qfin's business affairs. Because of their senior positions, they knew the adverse non-public information about Qfin's drastically worsening financial condition and false financial statements.

79. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Qfin's financial condition and results of operations, and to correct promptly any public statements issued by Qfin which had become materially false or misleading.

80. Because of their position of control and authority as senior officer, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Qfin disseminated in the marketplace during the Class Period concerning Qfin's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Qfin to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Qfin within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Qfin securities.

81. The Individual Defendants, therefore, acted as a controlling person of Qfin. By reason of their senior management positions and/or being directors of Qfin, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Qfin to engage

in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of Qfin and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

82. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Qfin.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 28, 2026

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*

Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044

jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Plaintiff*

**CERTIFICATION PURSUANT**
**TO FEDERAL SECURITIES LAWS**

1. I, I RAHIM NOORALI KASSAM, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Qfin Holdings, Inc. ("Qfin") and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire Qfin securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Qfin securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. The attached sheet lists all of my transactions in Qfin securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my *pro rata* share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**Executed** 9/10/2026
**(Date)**

DocuSigned by:
Ray Kassam
899CA795DBCD496...
**(Signature)**

RAHIM KASSAM
**(Type or Print Name)**

**Qfin Holdings, Inc. (QFIN)** **Rahim Noorali Kassam**

**List of Purchases/Acquisitions and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 5/27/2026 | 5,000 | $15.9900 |
| Purchase/Acquisition | 6/3/2026 | 3,000 | $15.2400 |